UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
                                                    )
ELBA S. DE OLIVEIRA,                                )
                                                    )
        Plaintiff,                                  )
                                                    )
        v.                                          )        Civil Action No. 14-12629-DJC
                                                    )
CAROLYN W. COLVIN,                                  )
Acting Commissioner,                                )
Social Security Administration                      )
                                                    )
        Defendant.                                  )
                                                    )
                                                    )
_____)

MEMORANDUM AND ORDER

CASPER, J.                                                          June 20, 2016

I.      Introduction

        On May 31, 2011, Plaintiff Elba S. De Oliveira ("De Oliveira") filed claims for Social

Security disability insurance benefits ("SSDI") and supplemental security income ("SSI") with

the Social Security Administration ("SSA").   R. 21, 76-78, 174-86.[1]   Pursuant to the Social

Security Act, 42 U.S.C. § 405(g), De Oliveira brings this action for judicial review of the final

decision of Carolyn Colvin, Acting Commissioner of the Social Security Administration ("the

Commissioner"), issued by Administrative Law Judge ("ALJ") Francis Hurly on January 29,

2013.   R. 1-4.   Before the Court is De Oliveira's motion to reverse the ALJ's decision and the

Commissioner's motion to affirm the ALJ's decision.   D. 13, 14.   For the reasons stated below,

_____

[1] "R" refers to citations to the administrative record, D. 9.

1

the Court DENIES De Oliveira's motion to reverse and ALLOWS the Commissioner's motion to affirm.

## II.      Factual Background

De Oliveira previously worked in retail, data entry and home health care.  R. 31, 44-46. On May 31, 2011, De Oliveira filed applications for SSDI and SSI benefits, alleging that, as of August 1, 2008, she was unable to work due to a right knee injury, stomach pain, asthma and depression.  R. 21, 76-78, 174-86.  At the hearing before the ALJ held on January 16, 2013, De Oliveira's attorney amended the disability onset date to September 16, 2010.  R. 68, 74, 217.

## III.      Procedural History

De Oliveira filed applications for SSDI and SSI benefits on May 31, 2011.  R. 21, 76-78, 174-86.  After initial review, the SSA denied her claims on September 21, 2011.  R. 106-11. De Oliveira requested reconsideration of her claims on September 30, 2011, R. 113, and on December 22, 2011, the SSA again found De Oliveira to be ineligible for benefits, R. 114-19. On February 8, 2012, De Oliveira requested a hearing before an ALJ, R. 121, which was held on January 16, 2013, R. 37-75.  In a decision dated January 29, 2013, the ALJ determined that De Oliveira was not disabled within the definition of the Social Security Act and denied her claims.  R. 18-36.  De Oliveira requested review of the ALJ's decision on February 4, 2013. R. 15-17.  On April 25, 2014, the Appeals Council denied De Oliveira's request for review, thereby adopting the ALJ's decision as the final decision of the Commissioner.  R. 1-7.

## IV.      Legal Standards

### A.      Entitlement to Disability Benefits and Social Security Income

A claimant's entitlement to SSDI and SSI turns on whether she has a "disability," defined by the Social Security Act as an "inability to engage in any substantial gainful activity by reason

2

of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 416(i)(1), 423(d)(1)(A); see 20 C.F.R. § 404.1505.[2]  Such impairment must be sufficiently severe, rendering the claimant unable to engage in any of her previous work or any other gainful activity that exists in the national economy.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505.

The Commissioner follows a five-step sequential analysis to determine whether an individual is disabled and thus whether the application for Social Security benefits should be approved.  20 C.F.R. § 404.1520(a); see Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).  First, if the claimant is engaged in substantial gainful work activity, she is not disabled and the application is denied.  20 C.F.R. § 404.1520(a).  Second, if the claimant does not have, or has not had, within the relevant time period, a severe medically determinable impairment or combination of impairments, she is not disabled and the application is denied.  Id.  Third, if the impairment meets the conditions of one of the "listed" impairments in the Social Security regulations, the claimant is disabled and the application is approved.  Id.  Fourth, where the impairment does not meet the conditions of one of the listed impairments, the Commissioner determines the claimant's residual functional capacity ("RFC").  Id.  If the claimant's RFC is such that she can still perform past relevant work, she is not disabled and the application is denied.  Id.  Fifth, if the claimant, given her RFC, education, work experience and age is unable to do any other work within the national economy, she is disabled and the application is approved.  Id.

---

[2] The Court notes that while this Memorandum and Order references only 20 C.F.R. Part 404, which applies to SSDI, Part 416 contains comparable regulations that apply to SSI.

B.     __Standard of Review__

This Court may affirm, modify or reverse the Commissioner's decision upon review of the record.   __See__ 42 U.S.C. § 405(g).   Judicial review is limited, however, "to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."   __Ward v. Comm'r of Soc. Sec.__, 211 F.3d 652, 655 (1st Cir. 2000).   Even where the record "arguably could justify a different conclusion," the Court must accept the Commissioner's findings of fact as conclusive if they are "supported by substantial evidence."   __See__ __Whitzell v. Astrue__, 792 F. Supp. 2d 143, 148 (D. Mass. 2011) (quoting __Rodriguez Pagan v. Sec'y of Health & Human Servs.__, 819 F.2d 1, 3 (1st Cir. 1987)) (internal quotation marks omitted); 42 U.S.C. § 405(g).   Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion."   __Irlanda Ortiz v. Sec'y of Health & Human Servs.__, 955 F.2d 765, 769 (1st Cir. 1991) (quoting __Rodriguez v. Sec'y of Health & Human Servs.__, 647 F.2d 218, 222 (1st Cir. 1981)) (internal quotation mark omitted).

The Commissioner's factual findings, however, "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."   __Nguyen v. Chater__, 172 F.3d 31, 35 (1st Cir. 1999) (citations omitted).   Thus, where the ALJ made a legal or factual error, __Manso-Pizarro v. Sec'y of Health & Human Servs.__, 76 F.3d 15, 16 (1st Cir. 1996) (quoting __Sullivan v. Hudson__, 490 U.S. 877, 885 (1989)), "the court may reverse or remand such decision to consider new, material evidence or to apply the correct legal standard," __Martinez-Lopez v. Colvin__, 54 F. Supp. 3d 122, 129 (D. Mass. 2014) (citation and internal quotation mark omitted); __see__ 42 U.S.C. § 405(g).

V.      **Discussion**

A.      <u>**Before the ALJ**</u>

*1.      Medical History*

There was extensive evidence regarding De Oliveira's medical history before the ALJ, including treatment records, assessments and diagnoses regarding her asthma, gastroesophageal reflux disease ("reflux disease"), back pain, depression and anxiety.  R. 36, 268-347.

a.      Physical Impairments

From August 2009 through November 2012, De Oliveira received primary care treatment for, *inter alia*, asthma, reflux disease, obesity and back pain at Signature Medical Group ("SMG").  R. 272-82, 299-301, 312-47.  In July 2010, after spending "most of the last year" in Brazil, De Oliveira saw Dr. Robert Weinstein at SMG for her asthma.  R. 275.  Dr. Weinstein noted that De Oliveira needed regular follow-up care and he completed three-month emergency disability forms with the qualification that De Oliveira should eventually be able to return to work.  R. 276.  Following another visit in August 2010, Dr. Weinstein updated De Oliveira's reflux disease medical protocol and noted that De Oliveira reported her asthma improved with the use of inhalers.  R. 272-74.  In September 2010, the status of De Oliveira's asthma was "fair" and Dr. Weinstein prescribed a nebulizer.  R. 346.

De Oliveira has a "long history of chronic back pain," R. 337, and received an epidural steroid injection "a number of years ago," at least prior to 2010, R. 346.  Sometime prior to mid-September 2010, she injured her lower back moving furniture at home.  <u>Id.</u>  Dr. Weinstein examined De Oliveira on September 16, 2010, noting tenderness to the right lumbar region, painful flexion and extension at sixty and twenty degrees, respectively, "non-painful side-to-side motion left," equal reflexes, intact sensory and motor findings and a negative straight leg raise

test.  R. 346-47.  As De Oliveira was not taking medication for her back pain at the time, Dr.

Weinstein prescribed a muscle relaxant and a nonsteroidal anti-inflammatory drug ("NSAID")

and recommended ice, heat and exercises as treatment for the back pain.  See R. 27, 347.

Shortly after the September 16, 2010 doctor's visit, De Oliveira spent six months in

Brazil.  R. 344.  Upon her return, she sought treatment again from Dr. Weinstein on May 2,

2011.  R. 344-45.  De Oliveira's back pain was "flaring up" but she was not taking her pain

medication at that time because she ran out while in Brazil.  Id.  De Oliveira also reported that

staying in one position for "too long" caused pain and stiffness.  R. 344.  At the May 2011 visit,

Dr. Weinstein conducted a physical examination and determined that she had tenderness to the

left lumbar region, painful flexion at sixty degrees, non-painful extension, "non-painful side-to-

side motion left," equal reflexes, intact sensory and motor findings and a negative straight leg

raise test.  Id.  Dr. Weinstein noted he would refer De Oliveira to physical therapy ("PT").

R. 345.

More than nine months later, having been in Brazil for the last month, R. 337, in

February 2012, De Oliveira again sought treatment from Dr. Weinstein for her back pain,

R. 337-39.  Dr. Weinstein examined De Oliveira's back, finding tenderness to the left lumbar

region, painful flexion and extension at forty-five and twenty degrees respectively, painful side-

to-side motion at twenty degrees on each side, equal reflexes, intact sensory and motor findings

and a negative straight leg raise test.  R. 338.  De Oliveira reported that taking Flexeril, a muscle

relaxant, "[did] help some" and that while "she did go to PT [in 2011]," she was doing a "home

program" at the time of the visit.  R. 337-38.  Later, on May 9, 2012, De Oliveira returned to Dr.

Weinstein for a follow-up visit regarding hypertension and asthma.  R. 333-34.  In addition,

De Oliveira also reported that her back pain was "flaring up" and that she was taking "a lot" of

medication.  R. 333.  Dr. Weinstein's notes indicate, however, that the pain was "positional" and that he did not perform a back examination.  R. 333-34.

On September 24, 2012, De Oliveira returned to Dr. Weinstein for her back pain.  R. 323-25.  Dr. Weinstein observed that "[s]he ha[d] gone to PT and [it] didn't help much."  R. 323.  De Oliveira reported that her back pain was "worse in the morning, then on and off during the day."  Id.  The physical examination showed tenderness to the left and right lumbar regions, painful flexion and extension at ninety and twenty degrees respectively, non-painful side-to-side motion, equal reflexes, intact sensory and motor findings and a negative straight leg raise test.  R. 324.  Dr. Weinstein also partially completed an RFC questionnaire at that visit, R. 299-301, and concluded that during an eight-hour work day De Oliveira would be able to "stand/walk" for less than two hours and sit for approximately four hours.  R. 300.  Dr. Weinstein reported that De Oliveira could "occasionally"[3] lift and carry up to ten pounds, "never" lift and carry twenty pounds and that she would need to take hourly five-minute walking breaks.  R. 300-01.  According to Dr. Weinstein, De Oliveira's impairments would cause her to be absent from work about three or more times per month.  R. 301.

b.      Mental Impairments

While De Oliveira has a "long history of anxiety issues," R. 274, the earliest note in the record regarding her mental impairments was from August 16, 2010, the same visit where Dr. Weinstein changed De Oliveira's reflux disease medication, R. 272-74.  De Oliveira reported experiencing anxiety, tearfulness and difficulty concentrating as a result of her husband being in Brazil and her daughter and two-year old grandchild moving into her home.  Id.  Treatment notes

---

[3] According to the RFC form, "occasionally" means less than one-third of the average eight-hour working day.  R. 301.

indicate that she "fe[lt] anxious and depressed [and] want[ed] to go back on meds." R. 272.  Dr. Weinstein prescribed De Oliveira clonazepam.  R. 274.  Later, in September 2010, Dr. Weinstein noted that while clonazepam provided "some" help, De Oliveira was "still having a lot of stress" and "some difficulty sleeping." R. 346.  Almost nine months later, De Oliveira returned from her six-month trip to Brazil.  See R. 344.  On May 2, 2011, De Oliveira saw Dr. Weinstein for follow-up care of her depression in addition to her back pain.  R. 344-45.  De Oliveira reported that she ran out of clonazepam while in Brazil and that she was "very anxious and tearful all the time." R. 344.  Dr. Weinstein suggested that De Oliveira contact South Shore Mental Health ("SSMH") for therapy and she agreed to do so.  R. 345.

De Oliveira received mental health treatment at SSMH from May 2011 through October 2012.  R. 284-91, 293-97, 302-11.  During that time, De Oliveira was seen by a therapist, Gartrell Saunders, R. 284-91, 302-06, 308, and by a nurse practitioner, Maureen Doyle, who managed De Oliveira's medications, R. 293-96, 307.  Saunders, De Oliveira's therapist, completed what appears to be an initial new patient case assessment with De Oliveira on May 24, 2011.  R. 284-91.  De Oliveira reported depressed mood, anxiety, difficulty sleeping, decreased appetite, increased crying, suicidal ideation and a suicide attempt two years prior. R. 285.  At the initial evaluation, Saunders noted that De Oliveira presented as cooperative, appropriate, anxious, fearful, depressed, worried and sad.  R. 289.  De Oliveira's thought processes and content were both considered normal.  Id.  Saunders diagnosed De Oliveira with depressive disorder and anxiety disorder, assigning her a Global Assessment of Functioning ("GAF") score of forty-five, R. 284, 290-91, a "significant" mental impairment, R. 73.

Beginning in August 2011, Doyle began managing De Oliveira's medication.  R. 295-96, 307.  On August 17, 2011, Doyle did a psychiatric evaluation of De Oliveira, diagnosed her with

depressive disorder, assigned a GAF score of forty-five and prescribed mirtazapine, an anti-depressant. R. 295-96. Following that visit, De Oliveira canceled two scheduled appointments, R. 294, and next sought treatment from Doyle in mid-September 2011, R. 293.

In October 2012, Saunders partially completed a mental impairment questionnaire and determined that De Oliveira had a "slight" restriction of daily living activities, "marked" limitations in social functioning, concentration, persistence or pace and "repeated" episodes of decompensation. R. 302-05.[4] Saunders noted that De Oliveira would "sometimes" require unscheduled breaks during an eight-hour work day and that she would "have difficulty working at a regular job on a sustained basis." R. 305. According to Saunders, De Oliveira experienced appetite disturbance with weight change, sleep disturbance, mood disturbance, recurrent panic attacks, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation and decreased energy. R. 302. Saunders reported that she saw De Oliveira every other week for one hour and again assigned her a GAF score of forty-five. Id.

2.    *SSA Records*

De Oliveira's medical records were reviewed by three state agency consultants in September and December 2011. R. 78-89, 92-105. Two consultants evaluated De Oliveira's case in mid-September 2011, including state agency physician Dr. Robert McGuffin. R. 78-89. As to De Oliveira's physical impairments, Dr. McGuffin concluded that she did not have an impairment severe enough to be considered disabling, R. 83, 89, and that she was capable of engaging in substantial gainful activity, R. 80, 86. Regarding De Oliveira's mental impairments, Dr. McGuffin noted that "situational anxiety and depression relating to familial

---

[4] The applicable form defines "marked" as "more than moderate, but less than extreme" and "repeated" means three or more episodes in one year. R. 304.

difficulties . . . [had] not significantly affected [her] ability to remember, understand and communicate with others." R. 83, 89. He determined that De Oliveira's anxiety and depression constituted non-severe impairments. R. 80, 87. Dr. Richard J. Milan, a state agency psychologist, evaluated De Oliveira's case on September 16, 2011. R. 81-82, 87-88. Based on De Oliveira's medical records, Dr. Milan concluded that De Oliveira had limited concentration and intact cognitive functions and that her mental impairment was non-severe. R. 82, 88. In reaching this determination, Dr. Milan noted that De Oliveira's symptoms were "episodic and managed well with [medication]." Id. He disregarded the GAF score of forty-five, "as it [was] not consistent with the remaining evidence," including that De Oliveira did not need ongoing counseling. Id.

On December 17, 2011, De Oliveira's case was reviewed by a state agency physician, Dr. John Gambill. R. 92-105. Dr. Gambill found De Oliveira's mental impairment to be non-severe. R. 96, 103. He noted that she had the "wherewithal to navigate global travel," she had only intermittent mental health support from her treating physician and her symptoms were managed well by medication. Id. Dr. Gambill also considered that De Oliveira "[was] able to rearrange and move furniture in 9/2010 with only a pulled muscle in [her] back," R. 97, 104, concluding that her "condition [did] not result in significant limitations in [her] ability to perform basic work activities" and thus found her not disabled, R. 98, 105.

### 3. *ALJ Hearing*

During the administrative hearing held on January 16, 2013, the ALJ heard testimony from De Oliveira and vocational expert ("VE") Elaine Cogliano. R. 37-75.

a.      De Oliveira's Testimony

De Oliveira testified that she previously worked in retail, data entry and home health care, R. 44-46, and that she was last employed in 2007, R. 44.  According to De Oliveira, she unsuccessfully applied for part-time retail positions in 2011.  R. 47.  She also testified that she does not socialize with friends, but that they speak on the phone twice a week.  R. 63.  Except for a weekly church service on Sundays, De Oliveira does not do any activities or hobbies outside of her home.  R. 63-64.

De Oliveira testified that depression prevents her from working, R. 47-49, and that she was fired from two positions–Macy's in 2001 and Attentive Home Care in 2006–due to her condition, R. 46-48.  She testified that her depression disrupted her sleep and caused her to arrive at work late.  R. 48.  De Oliveira also explained that, because of her depression, she cried at work and needed to "walk out."  Id.  She stated that she had been seeing Saunders and Doyle regularly for over a year and that Doyle prescribed her anti-depressants and sleeping medication.  R. 59-60.

Regarding physical impairments, De Oliveira testified that her asthma is mostly under control with the use of a nebulizer and inhalers.  R. 66-67.  As to her back pain, De Oliveira testified that she exacerbated a chronic back condition in 2010 by moving furniture, affecting her ability to work.  R. 50.  At the hearing, she described the discomfort as "sore and stiff and . . . constantly there," id., but worse in the early morning, R. 51.  She noted that bending is particularly painful, stating that it causes "a really bad pain" that is "horrible" and feels as if her back was "breaking."  R. 57-58.  De Oliveira also testified that the pain affects her ability to sleep, R. 51-52, prepare meals, R. 52-53, go up and down stairs, R. 53, 58, clean, R. 53, drive, R. 53-54, sit for more than an hour, R. 54, and lift more than a gallon of milk, R. 58.  When

asked about going up and down the stairs in her home, which she does twice a day, R. 58, De Oliveira stated that "it's painful, but . . . [she] [has] no choice," R. 53.

According to De Oliveira, she treats the pain with physical therapy, R. 51, 55, medication, R. 54, cold patches, R. 54-55, and chiropractic therapy, R. 55-56.  She testified that PT did not relieve her pain or stiffness, R. 51, and that cold patches help "for a little bit," R. 55.  She also stated that her chiropractor ordered diagnostic testing such as "x-rays" and determined that she had two broken discs in her back.  R. 56.  De Oliveira testified that the chiropractic treatment is "working," explaining that it provides temporary relief.  Id.  She also stated that since 2008 she had traveled to Brazil twice and that the flight is ten hours long.  R. 65.[5]

### b.    Vocational Expert's Testimony

At the hearing before the ALJ, the VE testified regarding available work for an individual of De Oliveira's age, education and work experience based on certain hypothetical scenarios. R. 70-72.  For example, the ALJ asked the VE to consider someone:

> who is able to lift and carry 20 pounds occasionally, lift and carry 10 pounds frequently, stand and walk for 6 hours, sit for 6 hours, occasionally climb ramps and stairs, never climb ladders, ropes and scaffolds, occasionally balance, stoop, kneel, crouch and crawl, and this person must avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dust, gases and other irritants.

R. 71.  The VE testified that, according to the hypothetical, the individual would be able to perform retail cashier work and data entry.  Id.  She also stated that such a hypothetical person

---

[5] Since 2008, De Oliveira may have traveled to Brazil four times.  Treatment notes indicate that she "returned from Brazil" at the end of July 2009, R. 277, and according to records from July 2010, De Oliveira was in Brazil "for most of the last year."  R. 275.  In May 2011, Dr. Weinstein noted that De Oliveira was in Brazil for the "last 6 or so months," R. 344, and in February 2012, he noted that she had been in Brazil for "the last month."  R. 337.

could work as an office helper, ticket seller and mail sorter.  R. 71-72.  Additionally, the ALJ

presented the VE with the following hypothetical:

> Assume a person of [De Oliveira]'s age, education and work experience who's
> able to lift and carry 10 pounds occasionally, stand and walk for less than 2 hours,
> sit for 4 hours, has to stand or sit alternatively every hour for 5 minutes, and this
> person would be absent from work 3 days a month.

R. 72.  The VE testified that, "[a]ccording to that hypothetical, the person would not be

employable.  There would be no jobs they could perform." Id.

### 4.      Findings of the ALJ

Following the five-step analysis, 20 C.F.R. § 404.1520, at step one, the ALJ found that

De Oliveira had not engaged in substantial gainful activity since September 16, 2010, the alleged

disability onset date, R. 23.   At step two, the ALJ found that De Oliveira's back disorder

associated with chronic lumbar pain, obesity and asthma constituted severe impairments.  Id.  At

step three, the ALJ determined that these impairments did not meet one of the listed impairments

in the Social Security regulations.  R. 26.  At step four, the ALJ determined that De Oliveira had

the RFC to:

> lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and walk
> for 6 hours, sit for 6 hours, and occasionally balance, stoop, kneel, crouch, crawl,
> and climb ramps and stairs, but never climb ladders, ropes, and scaffolds.
> Additionally, [De Oliveira] should avoid concentrated exposure to extreme cold,
> heat, fumes, odors, dusts, gases, and other irritants.

Id.  Based on this RFC assessment, the ALJ concluded that De Oliveira was able to perform her

past relevant work.  R. 31.  Finally, at step five, the ALJ found that there were "other jobs

existing in the national economy" that De Oliveira could perform.  Id.  Accordingly, the ALJ

concluded that De Oliveira was not disabled as defined by the Social Security Act.  R. 31-32.

**B.**     **De Oliveira's Challenges to the ALJ's Findings**

De Oliveira seeks reversal of the ALJ's decision or, alternatively, remand to the SSA for a new administrative hearing.  D. 13-1 at 1.  De Oliveira challenges the weight the ALJ afforded to various opinion evidence and contends that the ALJ's decision was not supported by substantial evidence.  Id. at 3.  Specifically, De Oliveira argues that the ALJ's findings were "not supported by substantial evidence," id., because:  (1) the ALJ erroneously dismissed the opinion of her treating physician, id. at 6; (2) the ALJ ignored the opinions of her treating mental health providers, id. at 5; and (3) the ALJ ignored the vocational expert's opinion, id. at 7.

> *1.     The ALJ Did Not Err in Determining the Weight as to the Treating Physician's Opinion*

De Oliveira argues that the ALJ erred in determining that "Dr. Weinstein's opinion [was] not entitled to controlling weight, as it [was] not supported by the medical record."  R. 30.  In De Oliveira's view, the ALJ ignored relevant, favorable evidence from Dr. Weinstein, her treating physician, and thus erroneously assigned his opinion minimal weight.  D. 13-1 at 6-7.  De Oliveira asserts that "the ALJ fail[ed] to consider or properly address objective diagnostic evidence of severe degenerative disk disease at L5-S1 as confirmed by radiological exam of [De Oliveira]'s lumbosacral spine."  Id. at 6 (citing R. 349).

The ALJ gave Dr. Weinstein's opinion minimal weight primarily because "it [was] not supported by the medical record" and it "fail[ed] to provide a diagnosis for [De Oliveira's] back condition."   R. 30.    The ALJ further stated that the record "show[ed] no referrals for . . . diagnostic testing."   Id.   The results of the radiological examination (the "Radiology Report") referenced by De Oliveira, D. 13-1 at 6-7, however, were not available at the time of the ALJ hearing.   While it is unclear exactly when this examination was performed, the

14

Radiology Report is dated January 18, 2013, two days after the ALJ heard De Oliveira's case. R. 349. Indeed, on February 1, 2013, following the ALJ's unfavorable decision, De Oliveira's attorney sent the Radiology Report to the ALJ, stating that the evidence "was not available at the time of the hearing." R. 348. As such, the ALJ did not and could not "ignore," see D. 13-1 at 6, what was not part of the record. [6]

Based on the evidence before the ALJ, however, he did not err in giving Dr. Weinstein's opinion minimal weight. It is well settled that an "ALJ is not 'obligated automatically to accept [a treating physician's] conclusions.'" Moore v. Astrue, No. 11-cv-11936-DJC, 2013 WL 812486, at *7 (D. Mass. Mar. 2, 2013) (alteration in original) (quoting Guyton v. Apfel, 20 F. Supp. 2d 156, 167 (D. Mass. 1998)). A treating physician's opinion on the nature and severity of an applicant's impairment is given "controlling weight" only if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [an applicant's] case record." 20 C.F.R. § 404.1527(c)(2). Thus, an ALJ may give less weight to a treating physician's opinion where it is "inconsistent

_____

[6] Although De Oliveira submitted the Radiology Report to the Appeals Council, R. 15, she does not argue that the Appeals Council erred in denying her request to review the ALJ's decision in light of the new evidence. Regardless, such an argument would fail. The Appeals Council determined that, while the Radiology Report was new, it was not material because the "information [did] not show a reasonable probability that, either alone or when considered with the other evidence of record, would otherwise change the outcome of the decision." R. 2 (citing 20 C.F.R. § 405.401(c)). Although the ALJ noted that "the record contain[ed] no diagnosis for her back condition" and that "[t]here [was] no indication of an MRI report," R. 29, it is unlikely that, considering the other evidence in the record, the Radiology Report would change the ALJ's decision. While the Radiology Report indicates a diagnosis of severe degenerative disk disease, R. 349-50, it does not provide additional insight regarding the actual impairments De Oliveira experienced. See, e.g., Mahamed v. Colvin, No. 14-cv-13258-LTS, 2015 WL 7009070, at *7 (D. Mass. Nov. 12, 2015) (acknowledging that new evidence such as "a lone 'progress note' confirming the diagnosis of two previously asserted ailments and offering no assessment of increased severity" would not warrant remand (quoting Mills v. Apfel, 244 F.3d 1, 3, 6-7 (1st Cir. 2001)).

with other evidence in the record including treatment notes and evaluations by examining and nonexamining physicians." Shields v. Astrue, No. 10-cv-10234-JGD, 2011 WL 1233105, at *7 (D. Mass. Mar. 30, 2011) (quoting Arruda v. Barnhart, 314 F. Supp. 2d 52, 72 (D. Mass. 2004)) (internal quotation mark omitted).

Where an ALJ determines that the opinion of a treating source is not entitled to controlling weight, the ALJ considers six factors to assess the proper weight to give the opinion: (1) length of the treatment relationship and frequency of examination; (2) nature and extent of the treatment relationship; (3) supportability of the treating source opinion; (4) consistency of the opinion with the record as a whole; (5) specialization of the treating source; and (6) other factors that tend to support or contradict the opinion.   20 C.F.R. § 404.1527(c)(2)(i)-(ii), (c)(3)-(6). Notably, the regulations "do not require an ALJ to expressly state how each factor was considered, only that the decision includes 'good reasons' for the weight given to a treating source opinion." Bourinot v. Colvin, 95 F. Supp. 3d 161, 177 (D. Mass. 2015) (quoting 20 C.F.R. § 404.1527(c)(2)).   An ALJ provides "good reasons" where he is "sufficiently specific to inform both the claimant and this reviewing Court of how each treating source opinion was evaluated." Id.

In assessing the relevant factors, 20 C.F.R. § 404.1527(c), the ALJ provided "good reasons" for not giving Dr. Weinstein's opinion controlling weight, R. 30, and the ALJ's determinations are supported by substantial evidence in the record.   Specifically, the ALJ considered the infrequency of Dr. Weinstein's examinations, the conservative nature and extent of his treatment of De Oliveira, the lack of medical evidence in support of his opinion and its inconsistency with the record as a whole. Id. To begin, the ALJ assessed the frequency of Dr. Weinstein's examinations. Id. Although Dr. Weinstein was De Oliveira's treating physician for

16

thirty years, R. 55, the ALJ noted that, according to the record, De Oliveira complained of back pain at a total of only four visits, R. 30.[7]   Substantial evidence supports the finding that Dr. Weinstein treated De Oliveira's back pain infrequently.   See R. 272-78, 323-25, 333-47.   For example, despite Dr. Weinstein's claim that De Oliveira's back condition was severe enough to cause her to miss three or more days of work each month, R. 30, 301, in approximately three years and a total of eleven doctor's visits, R. 272-78, 323-25, 333-47, he performed only four physical examinations on De Oliveira's back, R. 323-25, 337-39, 344-47.   Furthermore, there were periods of time where De Oliveira did not seek treatment from Dr. Weinstein for several months.   See R. 275-76, 323-25, 333-34, 344-45.

The ALJ also determined that the nature and extent of Dr. Weinstein's treatment of De Oliveira was "conservative" and thus "[t]he medical evidence [did] not support the findings in Dr. Weinstein's assessment."   R. 30.   The ALJ considered that Dr. Weinstein did not refer De Oliveira for an "MRI or other diagnostic testing," noting that Dr. Weinstein "fail[ed] to provide a diagnosis for [De Oliveira's] condition other than stating back pain."   Id.   The ALJ also found that Dr. Weinstein's conclusions were unsupported by his own treatment notes, which showed only "tenderness and minimal objective findings on examination" and "provide[d] no rationale or explanation for the restrictive limitations he list[ed] for [De Oliveira]."   Id.   Indeed, substantial evidence indicates that with conservative intervention, such as changing positions and taking non-narcotic pain medication, De Oliveira was able to find relief.   R. 337.   Moreover, as recently as September 24, 2012, De Oliveira reported to Dr. Weinstein that her back pain was

---

[7] De Oliveira complained of back pain at an additional visit in September 2012, R. 323-25, that the ALJ did not address.

"worse in the morning, then on and off during the day," R. 323, suggesting that these treatments reduced her pain.

Finally, substantial evidence supports the ALJ's finding that Dr. Weinstein's opinion was "inconsistent . . . with the record as a whole," R. 30, including the opinions of the state agency consultants, De Oliveira's activities and her own testimony.  For example, the impairments alleged by Dr. Weinstein are not supported by the state agency consultants' assessments that De Oliveira's back condition was not sufficiently severe to render her disabled.  R. 80, 86.  Dr. Weinstein's opinion is also inconsistent with De Oliveira's activities and her own testimony. The record indicates that De Oliveira's back pain did not prevent her from traveling to Brazil since her alleged disability onset date, R.  337, 344, a flight that takes ten hours, R. 65. De Oliveira testified that she simply takes her medication and gets up every two hours during the flight to relieve her pain.  R. 66.  According to De Oliveira, she is also able to attend weekly church services, go to doctor's appointments, drive, use public transportation and run errands. R. 63-65, 67.  Thus, because the ALJ's determinations are supported by substantial evidence, the Court concludes that he did not err in declining to give Dr. Weinstein's opinion controlling weight.

> 2.     *The ALJ Did Not Err in Determining the Weight as to the Treating Mental Health Providers' Opinions*

De Oliveira also argues that "the ALJ improperly ignored or discounted significant and probative evidence in the record favorable to [De Oliveira]'s position and thereby provided an incomplete residual functional capacity determination."  D. 13-1 at 6.  On four occasions, May

24, 2011, August 17, 2011, September 4, 2012 and October 18, 2012,[8] Saunders and Doyle independently assigned GAF scores of forty-five. Id. at 5. De Oliveira states that the ALJ "[made] no mention" of these scores, id. at 6, including the score from the mental impairment questionnaire ("MIQ") Ms. Saunders partially completed on October 18, 2012, R. 302-06, and the score from the psychiatric evaluation ("PE") Doyle completed on August 17, 2011, R. 295-96. In De Oliveira's view, "[t]he ALJ's failure to address this evidence represents a terminal deficiency in his findings." D. 13-1 at 6. This argument is not persuasive for numerous reasons.

To start, an ALJ "is not required to expressly refer to each document in the record, piece-by-piece." Cox v. Astrue, 08-cv-10400-DPW, 2009 WL 189958, at *5 (D. Mass. Jan. 16, 2009) (quoting Rodriguez v. Sec'y of Health & Human Servs., 915 F.2d 1557 (Table), 1990 WL 152336, at *1 (1st Cir. Sept. 11, 1990) (per curiam) (unpublished)) (internal quotation marks omitted). Indeed, "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party," Ramos-Birola v. Astrue, 10-cv-12275-DJC, 2012 WL 4412938, at *20 (D. Mass. Sept. 24, 2012) (alteration in original) (quoting N.L.R.B. v. Beverly Enters.-Mass., Inc., 174 F.3d 13, 26 (1st Cir. 1999)) (internal quotation marks omitted).

---

[8] De Oliveira points to an additional instance where Saunders purportedly assigned a GAF score of forty-five, June 27, 2011. D. 13-1 (citing R. 290). De Oliveira is correct to the extent that R. 290 indicates that Ms. Saunders assigned a GAF of forty-five. This score, however, is actually from May 24, 2011, the same date as Saunders' previously noted GAF determination. R. 284. De Oliveira mistakenly uses the June date of when Saunders' supervisor signed off on the May 24th assessment.

Here, in determining weight as to Ms. Saunders' opinion, the ALJ considered the MIQ and the PE[9] that contained two of the four GAF scores in question.  R. 30-31.  The ALJ considered the PE for a second time in assessing De Oliveira's mental impairments.  R. 24-25. The ALJ, therefore, did not err by not addressing each of the GAF scores given by Saunders and Doyle.  See Miller ex rel. K.M. v. Astrue, No. 09-cv-12018-RBC, 2011 WL 2462473, at *11 (D. Mass. 2011) (explaining that "[t]here is no requirement that an ALJ discuss every bit of evidence in the record" because "the presumption is 'that the ALJ has considered all of the evidence before him'" (quoting Quigley v. Barnhart, 224 F. Supp. 2d 357, 369 (D. Mass. 2002)).

Additionally, any argument that the ALJ erred in giving "little weight" to Saunders' opinion also fails.  The SSA uses "medical and other evidence to reach conclusions about an individual's impairment(s) to make a disability determination."  SSR 06-03P, 2006 WL 2329939, at *1 (August 9, 2006).  "Medical sources" can provide such evidence.  20 C.F.R. § 404.1512.  "The term 'medical sources' refers to both 'acceptable medical sources' and other health care providers who are not 'acceptable medical sources.'"  SSR 06-03P, 2006 WL 2329939, at *1 (citing 20 C.F.R. §§ 404.1502, 416.902).  Therapists and nurse practitioners are health care providers who are not "acceptable medical sources" and thus, fall within the second category as an "other medical source."  20 C.F.R. § 404.1513(d).

In relevant part, 20 C.F.R. § 404.1527(c), provides that, regardless of the source, the ALJ "will evaluate every medical opinion [he] receive[s]" and will consider six factors to determine the proper weight to afford a treating source opinion.  See supra pp. 15-16; SSR 06-03P, 2006

---

[9] The PE appears in the record twice.  R. 295-96, R. 310-11.  While De Oliveira cites the latter record reference, D. 13-1 at 5, and the ALJ cites the former, R. 31, both point to the same document.

WL 2329939, at *4 (explaining that "[t]he[] factors represent basic principles that apply to the consideration of all opinions from medical sources who are not acceptable medical sources as well as from other sources . . . who have seen the individual in their professional capacity"). Notably, there is a limit to the factors' applicability, as "[n]ot every factor for weighing opinion evidence will apply in every case." SSR 06-03P, 2006 WL 2329939, at *5. Thus, the evaluation of another medical source opinion "depends on the particular facts in each case." Id.

The ALJ did not err in giving Saunders' opinion "little weight," R. 30, because he provided "good reasons," 20 C.F.R. § 404.1527(c)(2), which are supported by substantial evidence. Specifically, the ALJ considered the lack of medical record support for Saunders' conclusions and the inconsistency of her assessment with the record as a whole. Id. The ALJ concluded that Saunders' opinion regarding De Oliveira's mental impairments was unsupported by the medical record where "mental health treatment records indicate[d] that [she] had improvement with medication." R. 31. The ALJ also determined that the restrictions Saunders alleged regarding De Oliveira's impairments "[were] inconsistent with [her] reported activities," noting that De Oliveira "[was] able to travel to Brazil, use public transportation, shop, drive, attend church regularly, and perform household chores." Id. Thus, the ALJ provided good reasons for why he gave Saunders' opinion little weight.

Notably, the ALJ's failure to state the weight afforded Doyle's opinion is not dispositive because the ALJ was "sufficiently specific" regarding his assessment of her treatment records. See Kruse v. Astrue, 436 Fed. App'x. 879, 881-83, (10th Cir. Aug. 19, 2011) (unpublished) (quoting Krauser v. Astrue, 638 F. 3d 1324, 1331 (10th Cir. 2011)) (internal quotation mark omitted) (upholding decision to deny SSI even where ALJ did not state the weight he afforded a treating physician's opinion but did acknowledge the source and her records). Indeed, this is not

a case where he "[did] not evaluate the[] treating source opinion[] at all." See Perry v. Colvin, 91 F. Supp. 3d 139, 153 (D. Mass. 2015).   Rather, the ALJ considered Doyle's opinion in assessing the severity of De Oliveira's alleged mental impairment, R. 24-26, De Oliveira's credibility, R. 29, and in making a determination as to the proper weight to afford Saunders' conclusions, R. 31.   Unlike in Perry, the ALJ here concluded that Doyle's "few progress notes" reflected that De Oliveira "experienced mood and anxiety related symptoms . . . but the longitudinal medical evidence [did] not support a severe and disabling mental impairment," as "[De Oliveira's] mental impairments [were] treated effectively with treatment compliance involving medication and therapy."   R. 25.   Accordingly, the ALJ did not err in being less than explicit regarding the weight he gave to Doyle's conclusions.   See Kruse, 436 Fed. Appx. at 883.

Moreover, the opinions of Saunders and Doyle are inconsistent with substantial evidence in the record.   Notwithstanding the GAF scores of forty-five, R. 284, 302, 308, 311, which De Oliveira contends "demonstrate serious impairments . . . and . . . [an] inability to work or maintain a job on a sustained basis," treatment records show that she did not require regular mental health treatment.   See R. 284-91, 293-96, 302-08.   On October 18, 2012, Saunders indicated that she treated De Oliveira every other week for one hour.   R. 302.   The record, however, suggests otherwise.   See R. 284-91, 302-06, 308.   For example, Saunders' treatment notes are limited to the initial assessment and original treatment plan from late May 2011, R. 284-91, an updated treatment plan dated September 4, 2012, R. 308, and the October 2012 mental impairment questionnaire, R. 302-06.   As to Doyle, between August 2011 and October 2012, she indicates medication management for De Oliveira only eight times.   R. 307.   Notably, in March 2012, Doyle began doubling the number of refills allowed on De Oliveira's

22

prescriptions, id., suggesting that Doyle considered De Oliveira's symptoms to be well maintained by her medication regimen.

Finally, the treating mental health providers' opinions are also inconsistent with the opinions of the state agency consultants who found that De Oliveira was not disabled.  R. 83, 89, 97, 104.  The consultants reviewed De Oliveira's medical records and determined that, because De Oliveira was able to travel and because her symptoms were neither chronic nor poorly managed, the GAF scores of forty-five were not supported by the evidence.  R. 82, 88, 96, 103. Given the inconsistency of the mental health providers' opinions with the record as a whole, the Court concludes that substantial evidence supports the ALJ's assessment of Saunders' and Doyle's opinions.

### 3.    *The ALJ Did Not Improperly Ignore the Vocational Expert's Opinion*

De Oliveira further argues that the ALJ improperly ignored portions of the opinion of the SSA's VE, Elaine Cogliano.  D. 13-1 at 7.  Specifically, De Oliveira contends that "the ALJ erred by ignoring the vocational expert's testimony that the time lost through unscheduled breaks and frequent absenteeism would result in an inability to sustain any gainful activity."  Id.

Such arguments, however, are more persuasive where an ALJ "never acknowledged the evidence that ran counter to his conclusions" and failed to "analyze, even minimally, the reasons for his resolution of the conflicts."  DaSilva-Santos v. Astrue, 596 F. Supp. 2d 181, 189 (D. Mass. 2009); see, e.g., Walker v. Barnhart, No. 04-cv-11752-DPW, 2005 WL 2323169, at *17-19 (D. Mass. Aug. 23, 2005) (denying the Commissioner's motion to affirm because the ALJ "made no reference to" evidence regarding likely absenteeism and failed to provide an explanation for his conclusion).

Unlike in <u>DaSilva-Santos</u>, the ALJ here did not ignore conflicting evidence regarding likely absenteeism.  R. 28-30.  During the administrative hearing, the ALJ asked the VE to answer a hypothetical question about an assumed set of facts, R. 72, that were based upon Dr. Weinstein's conclusions regarding De Oliveira's impairments, R. 299-301.  The ALJ, however, rejected Dr. Weinstein's opinion because it was unsupported by other medical evidence and it was inconsistent with the record as a whole.  R. 30.  In doing so, the VE's answers based on Dr. Weinstein's opinion were rendered irrelevant.  Had the ALJ instead accepted Dr. Weinstein's assessments, there might have been a question as to the relevance of the VE's response to the related hypothetical, but that was not the case here.  Accordingly, the Court finds that the ALJ properly considered the evidence and did not erroneously ignore the VE's testimony.

## VI.     Conclusion

For the above reasons, the Court ALLOWS the Commissioner's motion to affirm, D. 14, and DENIES De Oliveira's motion to reverse.  D. 13.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge